Please be seated. Good morning ladies and gentlemen. We're pleased to welcome this morning the Honorable Elaine Bucklow, District Judge from the Northern District of Illinois. We're very pleased to have her sitting with us. We have five cases on the calendar this morning. A sixth was rescheduled. We have a patent case from District Court, a tariff classification case from the Court of International Trade, two government employee cases and a veterans benefits case. The last three are being submitted on the briefs and therefore will not be argued. Our first case is Z4 Technologies v. Microsoft, 06-1638. Mr. Gottman. Thank you. Good morning. Good morning, Your Honors. May it please the Court. I'd like to start first with the 825 patent, which is in the blue brief at A204 is the section that I'm going to focus on. And in particular, I'd like to focus the Court's attention to Claim 44 and the first issue that we raised in our brief, which is whether the Court correctly construed the term user in both this claim and other claims of the two patents. And I'd like to point out first by looking at the language of Claim 44, which is at Column 17, that there are six independent places in this claim where the patentee contrasts with drumbeat, regularity and clarity, the difference between software, computer and user. If you start with line 31, for instance, it talks about enabling the software on a computer for use by a user. If you go down to the next claim element, it talks about enabling software on the computer for use by the user. If you go to the next element, it talks about the software on the computer for use by the user. The next element, software being enabled on the computer for use by the user. Jumping to the next to last element, it talks about the software, the user, and the computer. And then moving up to the element which begins at line 56, it talks about the user selectively choosing either manual or electronic. Mr. Gottman, obviously you think the claim construction is a key issue, and maybe it is. I'd like to ask you about the Brazilian publisher, Priorat. Yes, Your Honor. Related question. Yes, Your Honor. Please summarize briefly your argument with respect to that being invalidating Priorat. Judge Lurie, I think on Brazilian publisher, it is important to separate the two patents, which is not what C4 has done. So my argument will be slightly more detailed on the 825 than it will be on the 471 because I think the analysis is quite different for each of those two patents. That said, let me turn to the 471. The issues raised in this case, let me first talk about what's not disputed. It's not disputed that there was a product by the name of Brazilian publisher which was physically created in a box, reduced to manufacturing before the Colvin filing date. You claim it's 102G Priorat. That is correct. Which, of course, have been invented in the United States, notwithstanding the name Brazilian, you argue, that it was. Correct. And we have conclusive evidence on that, Your Honor. If you look at the appendix at 3650, you will see the box of Microsoft Brazilian publisher. You will see at 3652 on the bottom of the box, it says made in USA, Puerto Rico. And there is no dispute that Mr. Aiden Hughes, before he reduced the final code to final form and released the product to manufacturing in the United States in March of 1998, had come to the United States to finish his work on the product. That is very clear from his testimony. So to address the court's point about it being in the United States, there is no question that the product was finalized in the United States, reduced to practice and to a physical product in the United States, and coded and tested against the Microsoft servers which were in Redmond in the United States. There are a couple of issues there. One is the court's jury instruction that Priorat, the corroboration had to have been by one person, and the lack of evidence concerning who the particular inventors were. Am I correct? There was an issue raised by Z4 that we had to name an individual person as the inventor. But wouldn't that just have to do with the instruction? Is the instruction relevant if you don't have an inventor? Your Honor, I think the instruction is relevant because the product, no doubt, was invented by someone. It exists as a physical thing. It was created by people at Microsoft. And to now hone in a little more carefully on your question, the reason that the instruction mattered in this case, and if I may pause and just digress for one second, I think all of these legal errors about the instructions and the like are important for two reasons. One is if the jury was instructed incorrectly, if the instruction was in fact wrong, then it changes the standard of review in effect here, which is it shifts from asking the question of whether there's substantial evidence on the record to support the verdict and instead says what would happen or what could have happened if the instruction was correct? Could there have been evidence on the record that would have supported a verdict by us? But let me get back to the court's question. I apologize for the digression. It mattered because Z4's whole case at trial against Brazilian publisher was to focus on the document. Over and over again they said you need one document, and we had a series of product specifications. We had a series of technical memos. I can go through each of them. I have them right here in my binder. They were authored by multiple independent people well before this product was reduced to physical form, and as the court knows, it was reduced to physical form before the patent owner filed his patent. But isn't that instruction have to do with corroborating the testimony of an inventor? And if you don't have, and Microsoft wasn't claiming to have an inventor there, at least I mean obviously somebody invented it, but it wasn't claiming to have a particular inventor, wouldn't it just be discounted? I assume this was one of hundreds of instructions. It was one of, I don't know that I can tell you it was hundreds, but it was one of many. I will agree with you there. And what we did not do at trial, because I didn't believe under 102G we had an obligation to do that, was to say here is the person who did it. What we proved through these documents is that there were specifications which were authored by David Peeks, and Aidan Hughes was the guy who took those specifications, the specifications which have each and every element of each of the claims, and took them and coded them into software and made it into a product. So you're saying you had an inventor? There's no doubt we had an inventor. But a named inventor. Well, if you had to ask me, I would guess it's David Pierce, because every element is in those product specifications. There may be another gentleman that was earlier who handed off some of the work to Mr. Pierce. Have we ever had a case where there was 102G in validation without specifying who the inventors were? Yes, Your Honor, I believe that we have. And those cases are cited in the blue, if I recall. I'm not going to conjure up the names in my head. But it's the court talking about a company doing work. And if there is a need for one, you can see all the work in David Pierce's specifications. Didn't actually Microsoft sort of make a point of not naming an inventor at trial, or identifying an inventor? We didn't feel we had an obligation to identify a specific person under the statute, Your Honor. But certainly we put more than ample evidence in the record that the product was done. And it is corroborated no matter how you slice it, because the documentation of each of these was from multiple independent people at Microsoft. Okay, so that's why it would seem like a jury would have just said, oh, this instruction is only pertinent if we're talking about an inventor's testimony, but since you'd made a point of not having any particular inventor, I'm just wondering how much of an impact it could have had. As interpreted by Z4, the instruction was argued to require us to identify a single document to prove 102G invalidity. The instruction doesn't say that generally. It says an inventor's testimony of conception must be corroborated in a single document.  And the district court recognized that that's not correct, but in this case, why is that not harmless error in light of the fact that there was no testimony by an inventor? There was testimony from which the jury could have concluded that Mr. Hughes was an inventor. We didn't parse it down to Mr. Hughes was the inventor, or Mr. Pierce was the inventor. To the extent that it was necessary, and you argue that it wasn't even necessary. I do believe, Judge Lurie, that it is not necessary, but if it is necessary, there is overwhelming evidence in the record that these plain elements were in the documents supported by multiple independent people who wrote them. Mr. Gartman, let me ask you a question about 271F and the AT&T case. In looking through the record here, it seems to me that 271F was never an issue in this case. The complaint was predicated on infringement under 271A, and that the jury instruction was patterned after 271A, and the claims here in question seem to me to implicate and are relevant to 271A and not 271F. So to what extent is the AT&T decision at all relevant? The AT&T decision is relevant because there is no reasonable argument that can be made. It's in the expert testimony in this case that Z4's case was based upon worldwide sales. There's no question about that. And the expert reports that were prepared in advance, it's a known fact that it's approximately 50-50 for Microsoft. But there was never an argument that the sales did not implicate infringement under 271. I think I disagree respectfully with Your Honor because— But there's no jury instruction on 271F. We couldn't have gotten a jury instruction on that, Your Honor. We made a motion in limine to exclude foreign sales in advance of trial, telling the trial judge, in effect, we know this is not the law, but we hope the Supreme Court will address this issue and deal with it. I move for Jamal on the foreign sales issue orally at the close of evidence. Renewed it. What's the motion in limine directed to excluding foreign sales because they don't fall under 271A? Or was the motion in limine directed to 271F? Well, Your Honor, I don't remember the text of it, but I can't imagine I would have made the motion under A. Is it in the record? Yes, it is, Your Honor. It's not in your appendix, as I recall, but it's certainly in the district court record. It may well be in the appendix, the motion in limine. I didn't see it. I don't know off from memory. I didn't see it in the appendix, and it's not on PACER because it was under seal. But the point that we make, Your Honor, is that even if we had not ever raised this issue, and we did repeatedly, repeatedly, Jamal, motion in limine, etc., even if we had not raised the issue, this court has the authority under the Komodo tribe case, Kurok tribe case, to decide issues when you have a C change in the law. And there is a C change. Excuse me, Your Honor. There is a C change in the law. There's an F change. An F change. Good one. If that isn't the issue that was raised in your motion in limine, I would think you would have had to put that in your record on appeal to preserve it. The case did not exist until after we briefed, even finished our appeal briefing. So one of the things I wanted to ask today was whether we could have the opportunity to brief the AT&T decision with this court as well as the KSR decision, which we also raised at the trial, and it came out after the briefing was done. You did not renew the Jamal motion after the trial. We did, Your Honor. On this issue? If you look at our brief on the Jamal that was filed within 10 days after trial, we said in the text in the very first paragraph that we renew our Jamals. Now, what we did not do, and we also cross-referenced that in our new trial brief, what we did not do is elaborate further on the case law in AT&T or reiterate what we've been telling the court previously because, frankly, I don't think there was any point to do that. This court had made it clear that our position was wrong. And were we obligated to drumbeat it and get spanked by the district court when it was wrong, we knew that. And the only reason that I argue that we deserve to have it done again is because it has a $60 million impact in this case, roughly. And the Supreme Court changed the law after the briefing was done here, just like it did in KSR. Mr. Gottman, you've just about consumed your rebuttal time. But since we consumed it mostly with questions, we'll give it back to you. And Mr. Angelari needs it. We'll extend his time, too. Mr. Angelari? Judge Leary, may I ask one more question before I move on? Because I have other issues I wanted to raise, and I don't want to be precluded from raising new issues. We'll give you a minute. Thank you, sir. I thought you were going to ask one more question. I'll raise one more point. It sounded like you wanted to be able to give it. I would like to raise a couple of other points. And in particular, I wanted to address the point about the 825, the independent reason why we believe that even if the court correctly construed user, the 825 cannot be infringed. And that is because—and I think the briefs are not 100% clear on this, which is why I raise it. If you do an infringement analysis in this case on the 825 claims, and you choose a user or a computer, whatever of those items you choose as your user, and you walk through the claim elements, it ends up that you'll miss some of the elements at the bottom, whether you choose it to be a human being, which we believe is mandated, or whether you choose it to be a computer. And that is our argument on antecedent basis, which applies to the 825. Okay. Thank you, Judge Roberts. Thank you, Mr. Carpenter. Mr. Angelari, we appreciate your being here on short notice, and we regret the circumstances that require it. Please proceed. Thank you, Your Honor. As I try to look at this nine-issue appeal and develop some comprehension of what the global theme is, it seems to me, Your Honors, that what's going on here is Microsoft is not treating this court as a court of review. If you look at their key issues, and I guess I'm indulging myself in deciding which of the nine are key, but many of the issues, there's a brand-new story that was never presented to the district court. Brazilian publisher, the evidence that they rely on today to show that this software worked and that it had the elements of the claim was not presented to the jury in any meaningful sense. Yes, it's in the record. I'm not arguing that it's not in the record. But no one took these pie charts that are in their brief. No one showed them to the jury. No one walked them through the evidence. And I don't know how you can say that the jury had to believe the evidence that Microsoft is showing this court, which is the standard for an appeal of invalidity, when the jury basically would have had to sift through the record to find it. But there was plainly an incorrect instruction. On the one? On the inventor issue, Your Honor? Yes, on the one reference. And I think the judge nailed that, Your Honor. They had no inventor testimony on conception. Therefore, there was nothing – the instruction was – it never came into play. Isn't it well established, though, that the Brazilian publisher existed before the effective date of the patent? I don't think that's well established. I think that the primary evidence of record was testimony from Aidan Hughes, who didn't necessarily have personal knowledge on those dates. In his deposition, he was all over the map, April, May, June. The jury was free to reject his testimony on the dates. So I don't think it's well established. And there are plenty of other reasons why the jury could have found Brazilian publisher not to be 102G. Number one, if you look at page 11 of our brief, there's a pie chart for the accused product which shows a 49% rejection rate on 125 million users, 62 million rejections. They marked 3,449 documents for trial, not a single page showing a single rejection by a Brazilian publisher. That's plenty of evidence for the jury to find that it didn't work. 51% doesn't work? That's the accused. I'm sorry. 49% rejection rate. I'm sorry for confusing the board. The pie chart is the accused, not Brazilian publisher. So for the accused, they had data showing rejections. For Brazilian publisher, they had no data of any kind showing any rejections. Do I remember that there was evidence before the jury that Hughes or somebody, probably him, said that he completely redid what had been Brazilian? That's exactly correct, Your Honor. Another piece of evidence that the jury clearly could have relied on to decide that Brazilian publisher wasn't the accused. We presented an email from Mr. Luiz Mancao. His name is famous for us. It's a November 98 email. The chronology is Colvin filed in June of 98. They say they were done it before. In November 98, this email says we've got 40 people registering the same copy of software. The jury could have accepted that. They concealed that from us, so the jury was given instruction as well, which is not appealed. So there is plenty of evidence from which the jury could have found that Brazilian publisher was not 102G. And again, the standard review is very high. They have to provide clear and convincing evidence that the jury had to believe. And there's plenty of evidence. Not only is there plenty of evidence that the jury didn't have to believe, but we submitted affirmative evidence to the contrary. Another sort of new issue or new spin, the automatic issue. At trial, we had a claim construction hearing, and it's recorded in Judge Guthrie's opinion on page 58. Our position was that the user could choose manual or automatic, and then after that it was automatic. Their position was that the user couldn't choose. It was completely automatic. The issue was whether automatic precluded the user choosing. On appeal, they've conceded that the user gets to choose. They've conceded the only issue that was before the court. And they're asking this court to find a brand-new construction, namely that the user has no knowledge, which was never presented to the district court. Could you address the AT&T district court? Absolutely. I'm sorry, did you have a question or did you want me to address it? She'd like you to address the AT&T court. AT&T is irrelevant. This was a 271A case. They moved to limit A on 271F, and they got it because we didn't present any 271F evidence. The J-Mall is moot because there wasn't a 271F case. This was tried under 271A. The jury was instructed under 271A. We presented what our view was on the appropriate royalty base under 271A. They presented no contrary evidence. This is an extraordinarily simple issue. So all of the evidence presented on damages was evidence directed to making, using, selling, offering for sale in the United States? In our view, yes, Your Honor. Even though that encompassed, obviously, sales activities relating to foreign parties, but your position was that those were nonetheless sales under 271A? Yes. Not sales of components as implicated by 271F? Yes, and there are a couple of reasons for that. One, we believe the methods practiced in the U.S., even if it's a foreign sale because the requirements that are imposed on those people are basically requirements that are mandated from Redmond, Washington. The comparison step, which is the key to the anti-piracy invention, is conducted on servers in Washington. The software that's the server software is in Washington. And equally importantly, Microsoft achieves a worldwide benefit from their U.S. infringement because if they didn't infringe in the U.S., if the software was readily available in the U.S., the protection would be useless overseas because everyone else could just go get U.S. software and copy it. So for those reasons, we took a position on the royalty base. The position was not challenged at trial, and that ends the appeal issue. This isn't a jump ball. The 471 patent is directed to media containing the software. The 825 patent is directed to the two claims in issue directed to a method. What was your theory for damages with respect to the method claims? In what way were the method claims—what was your view, that it was sold, offered for sale, not used? Those method steps are practiced by Microsoft in Washington. The requirements of the—you require the user to enter the code, requiring the user to contact the representative, comparing the previously stored registration information. All those acts by Microsoft are—the requirements are, in a sense, almost a corporate act. You're creating a structure in Washington that requires your users to do certain things. That requirement is created. It's practiced, if you will, in Washington. The users were not in Washington. The users were not in Washington, Your Honor. That's true. So some portions of those claims implicate activity outside the United States. That's true. But does that involve 271F or does that involve 271A? I think you could make the case that it's either. Under 271F, for example, AT&T cars out in a footnote, it cars out method claims. But we took—it doesn't matter. Either way, it applies. The method's practiced in the U.S., and the method's parked out under 271F. With respect to the motion in limine, since I haven't been able to get access to it, was that motion directed to 271F? Yes. It was? Yes. And presumably then the JML that was filed related to that issue, but the JML was never renewed. Correct. As I understand it. Mr. Gartman seems to indicate that it was renewed because there was a statement sort of referring back generally to all of the previously filed JMLs. Is he correct? I don't know if he's correct in the statement. I trust he is. I don't have any reason to—if the words are there, the words are there. But my view would be that that omnibus catchall doesn't cut it. I don't think that meets the requirements of the rules to renew your motion. Mr. Angellari, would you like to discuss the construction of user? Yes. Which Mr. Gartman seems to think is a key issue. Yes. The judge got it right, Your Honor, because what he did was he clarified that the comparing step, the determination required in the claim, can be based in part on the computer. And again, we have a position change here that I think is significant in context. At trial, the issue was whether the computer had any role. Microsoft was adamant, and we presented in the briefs. I won't go through everything, but initially they said it had to be a known pirate, which means you're making a determination based on the identity of the user. The computer is irrelevant. In the opening statement, Mr. Gartman talked about human beings. Again, the focus is making the determination based on the identity. We get the claim construction. The judge asked Mr. Gartman, what's the claim construction? He says human being, or I don't remember the word, but he says definitively person, just a person. Mr. Brooks stood up, and he said his first construction was the user includes the computer, and then eventually we had the construction offer, which was the person using the computer. The issue was whether the computer had any role whatsoever. They said it didn't. We said it did. The judge correctly looked at the specification and saw that the specification referred to an authorized user as a computer, and rightly so because that's – in this context of this invention, they're almost one and the same in a sense. You have a person sitting down at a computer who wants to activate his or her software. Microsoft and the patent invention looks at information about the software and the computer to decide whether that person is authorized to activate. So a person requests an activation, and Microsoft says yes or no. Is it the person who's authorized? Is it the computer who's authorized? It's semantics. It's one and it's both, but the claim isn't about what the authorized user – it's about how the determination is made. It is expressed that the determination can be based on the person or the user, the software, or the computer. Judge Davis got it right. He clarified for the jury that that determination could be based on the computer, and the specification supports it. And, in fact, inserting a person into the claim – inserting a person using a computer into the claim would make the claim lead. Now, the position change that I mentioned – in their opening brief, the position was that Colvin authorized users regardless of the computer. Again, that's based on this identity. He had to have the identity. Their claim construction position was still definitive. Users should name person. That's on page 34 of their brief, appeal brief, the blue brief. This court should hold as a matter of law that user means a person, not a computer. For the first time in their reply, Your Honor, Your Honors, they are acknowledging the fact that the computer has a role. Now they say, properly construed – this is page 4 of the reply – user is a person or a person using a computer. That's the issue that we were fighting about, whether the computer has any role. And we've had this position changing going on in all these issues. So the judge got it right. The claim reads. It's just that simple. For the other issues, they're substantial evidence issues requiring a password. There's admissions in the record that we put in before the court that show the claim reads. For the other jury instruction issues, you've asked about the corroboration. There's three others. There's a burden of proof, which is contrary to this court's law, the instruction they wanted. KSR, they didn't prove it. It's just conclusive evidence. They didn't make a grand case, and KSR's got no role. We talked about AT&T. If the court has any further questions. Thank you, Mr. Anshelary. Mr. Gottman will give you your rebuttal time back. Thank you, Your Honor. Not new issues, just in rebuttal. Thank you, Your Honor. I'd like to start with the user point that was just addressed. Again, it was with drumbeat clarity in the patent claims as well as the specification that there was a difference between user, computer, and software. And that is in both of these patents because if you look at the 471, the court's construction addressed the 471 as well as the 825. And if you look at the phrase, the software in the 471, you can see that it follows in every single limitation. What do you do about the part in 44 about comparing previously stored registration information related to at least one of the software they used in the computer? Yes, Your Honor. Your question was? Well. I'll address it if you'd like. Okay. I mean. I have four points to make in response to that question. Go ahead. And I don't mean to interrupt, Your Honor. No. First, it is with drumbeat regularity that they are differentiating user, computer, and software. And then to then claim that that clause authorizes them to say, but when we say authorized user, we necessarily mean authorized computer, which is in essence their argument. Isn't that really what is meant? No. It's not. It isn't, as they pointed out or somebody pointed out someplace, it isn't like they care whether or, you know, either side cares whether my son sits down at the computer that I have authorized. What they could have done, Your Honor, might have been different. What they did do was they notified us and the public that they are talking about authorized user in both of these claims. They have clearly defined what that term means, and they have examples in their patent specification of ways to collect information such as names, addresses, e-mails of persons. So clearly it is contemplated by them that a user can be a human being who has human being characteristics that are outside of the context of the computer. Isn't that one way of practicing it? It is not the claim. It is the claimed way of practicing it, and our way is not the claimed way, which is our point. They could have said authorized machine. They could have said authorized computer. They didn't. That's our point. And in fact, in their own literature, they use authorized machine. Mr. Colvin did. So just a couple more points on that. I examined their expert on this very point and asked him, can you answer black and white whether I'm an authorized user when I buy software and install it on my machine? And he said, generically, yes. With respect to the patent claims, I don't know. Mr. Colvin, that's at A1712, and it continues at A1735, and it continues again on page 186 of his deposition. And Mr. Colvin himself, and this is at A1483 and A1484, uses unauthorized machines in his literature when he describes Microsoft's approach. Not unauthorized user. He uses unauthorized machines. That's Exhibit 250. So user is a clear point for us. Mr. Angelari raised the notion of rejections. And earlier, in response to a question by Judge Lurie, I said the 471 is very different. And I encourage the court to look at it. It doesn't talk about rejections. It doesn't talk about stopping piracy. It says nothing about that. It doesn't talk about comparing information in the database with previously entered information. All of that is conspicuously absent from the 471. And all it says is you get registration. You get authorization. And in closing argument by counsel that was admitted, the Moncow email says that the software has been registered and authorized. That is all that's required for the 471. It doesn't require a rejection, period. And does it reduce piracy? Take a look at Claim 1 of the 471 patent. All it talks about is a two-password approach. A two-password approach reduces piracy. Judge Land, you had a question about worldwide sales. I'm going to try to address that as quickly as I can. Mr. Braddock, their expert at trial, testified his testimony was based upon worldwide sales. Our motion to brief AT&T, which we made to this court following the briefing after the case came out, shows that they read the interrogatory response of us into the record, which is about the golden master process, which is addressed by the Supreme Court in AT&T. It is the very same evidence that was in AT&T, so I think the record should be very clear. We are talking about the golden master distribution process. Microsoft only has one, and fully half of what was addressed by this jury was those foreign sales. Mr. Gottman, I think we've given you extra time, and so with drumbeat clarity I think we have to bring this argument to an end. Thank you, Judge Land. The case will be taken under review.